The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oye, oye, oye, all persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw an eye and give their attention for the Court is now sitting. God save the United States and this Honorable Court. All right. Well, we are very happy to be here for argument in person with you today. And we will hear argument first in number 21-1168, Sony Music v. Cox Communications. And Mr. Rosenkranz, whenever you're ready. Thank you, Your Honor. May it please the Court. Josh Rosenkranz, representing Cox. Your Honors, all Cox does is provide an internet connection to subscribers for a flat fee. We don't encourage subscribers to download music illegally. We don't make a penny more when they do. We did not create the software, the websites, or the servers that are necessary to commit infringement. And it is undisputed that we cannot block or monitor or in any way police the infringement that goes on in our infrastructure or any other bad conduct that occurs on the internet for that matter. No notion of tort law or copyright law ever conceived would authorize liability for an actor that is this far removed and this uninvolved in the unlawful conduct, especially for the tens of thousands of subscribers with only two or three accusations of infringement. And that is why the judgment that is before this Court now on appeal is unprecedented in every way, from the massive astronomical size to its boundless legal theories to the staggering implications of a legal rule that requires internet providers to implement mass evictions from the internet upon receipt of just a couple or three accusations of infringement. Now, there are any number of ways to invalidate this judgment. I'd like to spend my time today, if the Court permits, focusing on one element of each of the liability claims, the direct financial benefit element of vicarious liability, and the frankly stunning grant of summary judgment on knowledge for tens of thousands of individual claims of knowledge. And if time permits, it will be really important for me to get to one of the legal rulings that was responsible for multiplying the damages award by four. To start with vicarious liability, plaintiffs failed to prove that Cox directly benefited from the infringement. Again, we charge a flat fee. We make the same amount regardless of whether our subscriber uses the internet to download music illegally or to watch cat videos. If the subscriber saves $0.99 on a download, we don't get a $0.50 cut. Every court to address this context, and there are dozens, agrees that the general rule, the general rule is that collecting a flat fee for a service is not a direct financial benefit from the infringement. Counsel, can I just ask you just a procedural question? You're not challenging the jury instructions in this case, right? That is correct, Your Honor. So you are content with the judge's instruction on the direct financial benefit? That is correct, Your Honor. We're challenging the legal theory on which the judge found the evidence sufficient. And on that legal theory, plaintiffs are urging this Court to break from the consensus view and hold that it is enough to prove that we made money from the infringers simply by not terminating them when we learned of infringement. But what if the jury thought there was direct financial benefit for some other reason? I understand that the district court approved it for that reason, but there was no specific instruction to the jury on this. So maybe the jury thought the evidence that Cox makes more in fees when people are using these peer-to-peer networks, and they, I'm sorry, I don't know the technological terms, but they take up more bandwidth or whatever, and so the fees are higher. Maybe that's what the jury thought. Well, so, Your Honor, let me go directly to that. And that would be an argument about draw, that the higher bandwidth is what drew infringers to the, excuse me, what I should say is that infringement is what drew the infringers to want to collect more money, excuse me, is what drew the infringers to pay more money for higher bandwidth. The problem with that is that it is a classic correlation-causation fallacy. The evidence was that the people who infringed the most, the ones who were at the very, very top of the infringement pyramid, were more likely to have purchased Internet with a higher speed. Now, there are so many explanations for that. The most common sense one being that people who live their lives online are also people who are going to infringe more. There is nothing in the record that suggests that a single one of these people had faster Internet because they wanted to download infringing songs. And plaintiff's experts admitted this, just like he admitted that he had no idea why anyone buys Internet service. He said, quote, there are many high-tier subscribers that don't infringe. That's at 623. And he admitted, quote, I don't know why anyone chose to purchase higher-tier service. Subscribers buy fast service for all sorts of reasons, most notably lawful streaming like Netflix or because their households have so many Internet users. There is no evidence and no reason to believe that when you stop a subscriber from infringing, they're going to cancel their high-speed service. And then just turning back to the theory that the district court adopted, the district court adopted this theory that we made more money simply because we did not terminate people. Let me ask you this question. It seems like the appellees are suggesting that the revenues from the high-speed accounts demonstrate a draw. But doesn't that go to conscious motivation and not to customers? To conscious motivation and not to what, Your Honor? Does the higher revenues demonstrate a draw? But doesn't that go to conscious motivation and not to customers? Oh, yeah. Well, so, yes, Your Honor. And so does the point that I was just making. It goes to conscious motivations and not to the customers. Whether you are talking about what gets you, what gets the customer to buy Internet service or what gets the customer to buy higher-speed Internet service, the draw has to be what is drawing the customers. And there was no evidence. Again, the expert that I quoted earlier also said the same thing about not knowing what draws people to Internet service. Now, we know what draws people to Internet service. It's the fact that you cannot live a modern life without getting Internet service. But there is no evidence on this record that infringement was what was drawing people to Internet service or what was keeping them there. And on the high-speed point, there's no evidence that anyone canceled high-speed service upon learning, oh, my goodness, I can't infringe anymore. If there are no more questions on direct financial benefit, I'd like to turn to knowledge, if I may. Yes, and I don't mean to push you off your plan. But on contributory infringement, I guess I want you to talk about the part that went to the jury, which I guess is sort of what I think of as the conduct prong, not the knowledge prong. And I am confused because, again, there is no challenge to the jury instruction. So your position has to be that no jury could have found on these facts a material contribution or inducement or causation on the evidence presented at trial. And the evidence presented at trial, right, was not just that Cox did not immediately terminate, didn't, I think, what you called evict from the Internet after a couple of notices. There was all that other evidence, the same evidence that this court in BMG thought took Cox out of the safe harbor. All of that evidence of the sham policy and misconduct, the emails. And so I want you to have a chance to address, because I really didn't see this in the briefing, the facts of this case and why a jury couldn't infer kind of a culpable intent to encourage infringement from that evidence, not from the failure to cut off after one or two notices, but from the larger aggregation of evidence in this particular case. So yes, Your Honor. So material contribution is aiding and abetting liability. There has to be a culpability with respect to each act of infringement. So just as in BMG, there was a requirement that the knowledge element be satisfied to a substantial certainty that this particular accused infringer is substantially certain to continue infringing, there also has to be culpable intent for Cox that you can infer the intent that that person will continue infringing. You can't possibly satisfy that standard with respect to three quarters, I mean easily, with respect to three quarters of the accused subscribers here who stopped infringing by the third notice. It's got to be a subscriber by six quarters. Well, I don't want to take the attention away from this prong that Judge Harris is interested in, but your culpability argument seems to be talking now about knowledge, right, that you have to be able to foresee that this particular subscriber is going to infringe again. So yes, that, Your Honor. But you also have the plaintiffs also have to demonstrate Cox's culpable intent with respect to that subscriber. If two-thirds of the people who are accused of subscribing stop infringing after the third notice, Cox shouldn't be terminating them, and failing to terminate them cannot be culpable intent. And I see, Judge Harris, you're looking again because your earlier question was about, well, the whole course of conduct. Secondary liability has to be about what the culpable conduct was here, and we did not proximately cause the culpable conduct of the person who infringed twice and then infringed a third time. Well, but we did say, right, in BMG that, you know, we apply the regular rule that ordinarily people intend the consequences of their actions. And I understood the district court to be saying, look, there were simple measures that Cox could have taken here, not cutting everybody off after two notices, but doing something about copyright infringement. And on this evidence, this jury was entitled to find that Cox did nothing. It didn't take any simple measures to try to address the problem. And I guess I'm asking you to explain why you couldn't infer from that, that failure to do anything, and instead to have a sham policy and an intentional, purposeful effort not to actually employ it to address the problem. Why you couldn't infer from that what we talked about in BMG, just that, you know, that you intend the normal consequences of your failure to take a simple measure. Right. So, Your Honor, I'll address it in two pieces. And I see my time is running out, and so I do want to get to the other point and to knowledge more specifically. So about the culpability point, that is what you described as the conduct point, you made two points. The first is simple measures. Now, the Supreme Court's standard is about affirmative steps. Simple measures is simply something that the Ninth Circuit came up with that wouldn't even apply here, because there are no simple measures other than terminating those people with two or three or four acts of infringement. At least nothing else that got us held liable. And then the culpability that this Court assessed in BMG, that was about the top of the pyramid. It wasn't even the top.  It was the tiny, tiny percentage of people who were not terminated when they got to the termination stage. But bear in mind that we are talking about conduct that is committed at the hands of only 1% of our subscribers. And only 0.05% of them are at the top of that pyramid. 95% of that 1% stop infringing before you ever get to the termination phase, which was the culpable conduct that this Court observed in BMG. Well, let me ask you. It seems to me the judge directed a verdict or directed on the specific instances and that he didn't charge. Well, he said the second element, the cost of specific instances of infringement has already been established. Why wouldn't that object it to? Why was the jury instruction? Why wouldn't it object it to? Oh, well, so, Your Honor, we did object. The judge directed a verdict based upon his summary judgment ruling, and we certainly took exception to the summary judgment ruling. And so what the Court did here was to direct a verdict on summary judgment that knowledge was satisfied. Now, knowledge is the quintessential fact question, yet the District Court directed a verdict, not just that we had general knowledge about bad conduct at the top of the pyramid, but we had specific knowledge as to each particular accused infringer. This Court could not have been clearer in BMG about what plaintiffs have to prove, that Cox could not be held liable for any infringer's act of infringement unless Cox knew that that specific infringer was substantially certain to commit the next act of infringement. BMG repeatedly emphasizes that this is a — I assume I agree with you. Where in your summary judgment briefing was predicting future infringement discussed? Where was this argument raised? Oh, Your Honor, no one disputes that we raised the argument about future acts of infringement. We said over and over again, just because you have two acts of infringement or three acts of infringement does not prove that the next act of infringement will occur. Plaintiffs argue that we did not make a past acts argument, but they're not arguing that we did not make the argument that I'm making to you today, that the past acts — Well, just to help me, maybe you can un-reply. You can give me the JA pages. I did read your summary judgment briefing, and I think you're making a good point now. But I had trouble finding the point about predicting future conduct. Certainly, the district courts seem to proceed as though past instances of infringement were sufficient. So, Your Honor, it's at JA 1998, and I'll quote, Repeat infringement cannot be imputed merely from the receipt of notices of infringement. And so that's where we made that argument. I see my time is up. If the court will permit, I would, in the interest of not getting fired, I'd like to at least make one argument on the damages. I'll give you just a minute or two. Okay. That is if the court has no more questions on knowledge. Yeah, just a minute or two. Okay. So let me just focus on the derivative works issue. That is a $220 million legal error. There is no material dispute of fact that more than 2,200 of the sound recordings for which plaintiffs recovered  we documented the duplication based upon evidence that was in the trial record. The district court told plaintiffs that they had to, quote, produce sufficient evidence to contest any of them. Plaintiffs availed themselves of that opportunity as to 135 of the recordings, which we are not now contesting. But as to the vast majority, that's 94% of all of the sound recordings, plaintiffs had nothing to say. Under basic JMAL principles, then, the district court had no choice. There was only one reasonable answer to the question as to whether any of those 2,200 works were entitled to a separate award. So there was no question for the jury to resolve. The district court initially agreed with us that it had all it needed on the record to conduct the analysis, but then it decided not to. It reasoned that this was not a ministerial task. But JMAL doesn't depend upon whether you characterize something as ministerial or requiring judgment, and the protest about the effort that would take was irrelevant because plaintiffs' decision to sue over more than 10,000 works did not relieve them of the basic burdens of putting evidence in if they want to dispute a material fact. What number was given to the jury by Cox for the number of works that were infringed? Well, so, Your Honor, the judge decided not to instruct the jury about a particular number, excuse me, about this question of derivative works. So we didn't argue to the jury derivative works, but the number that we thought were derivative works at the time was 2,370. And when plaintiffs said no— Was there evidence put in front of the jury? I know you didn't argue because the judge rejected your jury instruction, but I guess what was the testimony or the evidence to the jury to help them make this distinction? I know they had PX1 and PX2 in the registrations, but what was the evidence to help them discern the lower number? So, Your Honor, that was it. It was PX1 and PX2. It would take a lot of work, of course. The judge refused to allow us to put in additional tabulations, but the bottom line is on JMAL what matters is what was in the record before the jury and whether there was a material dispute of fact, just as there would be in summary judgment. Courts all the time decide this number of works question as a matter of law, and when plaintiffs did not put at issue, did not dispute the material fact as to 2,235 of them, the district court had no choice but to direct, but to issue a JMAL order. Thank you, Your Honor. Thank you. Good afternoon, Your Honors. May I please look forward? Can you all hear me if I keep the microphone here? Okay. My name is Kate Stetson. I represent the plaintiff copyright holders in this case. I want to start with just a couple observations, and then I'd like to turn to your questions to Mr. Rosenkranz. But the two overarching observations I would offer are these. First, this is not a case that broke some seismic new ground in copyright law. This was a case about an Internet service provider that was found to have facilitated rampant copyright infringement on its systems. And as Judge Harris, you pointed out, this isn't about whether the provider should have terminated every subscriber upon every instance of infringement. Thank you. This is about whether the provider could do something, and it certainly could do something up to and including termination for infringement. It could have suspended. It could have educated. It could have throttled bandwidth. All of these things are in the record. This is not a narrative about terminating every subscriber, and that's what it's turned into on appeal. I agree. It has sort of turned into that on appeal, but I thought that was your position, that as long as an ISP has specific notice of one or two infringing acts, then it's going to be contributorily liable if it doesn't immediately terminate service. Is that not your position? No, I think our position is broader than that. Our position, and the district court articulated this below as well, is the ISP needs to do something. It needs to suspend or terminate. In fact, the district court, during the proceedings, there were repeated testimony from multiple witnesses about the other things that could have been done, including education, including suspension that I mentioned, including throttling bandwidth. So this is not just that singular narrative. Second of two points. I think with respect to both BMG and the jury verdict, what you see in the briefing and what you've heard today is a little bit of relitigation of both of those things. This court held in BMG that to satisfy the proper standard for knowledge, the ISP needed to have specific enough knowledge about specific subscriber's infringements to do something about it. That was the proper standard this court articulated. So to the extent that there's a backdoor challenge to BMG going on here, including with respect to what a repeat infringer is, which you'll remember was an issue in BMG, that's not proper. The second thing is relitigating the jury verdict. Judge Harris, you asked a couple different times, I think, about challenges to the jury instructions, and Mr. Rosenkranz correctly answered that those weren't the challenges that he was making. But what you heard today on a couple different points was challenges to the evidence. So let me start with your first question, Judge Harris, with respect to direct financial contribution. And here, to begin with, I would say direct financial contribution, and this goes to your question too, Judge Floyd, the standard that Cox articulated in its own brief is, did the defendant directly profit from the infringement while doing nothing to stop it? So the draw, the angle of the draw to subscribers, isn't, I think, the appropriate way to look at the direct financial benefit question. The bottom line question is, did this defendant, did this ISP, directly benefit from the infringements? And what you have in front of you with respect to the jury verdict was site after site after site of examples of testimony and evidence given showing that Cox was making considered decisions not to terminate because of the benefit that was flowing to it from infringers. So just to give you a couple joint... Well, that kind of glosses over what the benefit is from, right? The benefit has to be from the infringement, not from the fact that users continue to pay the same flat fee. Would Cox have made less if those subscribers had stopped infringing but kept their Internet service? Judge Rushing, there's two responses to that. The first is I think that reading of direct financial benefit is a little narrow. There is one Ninth Circuit decision, Giga News, that talks about that being kind of a one-to-one correspondence, but the great majority of cases, including others from the Ninth Circuit, talk about it like the Ninth Circuit did in Fonavisa, which is if a swap meet owner is hosting the site and facilities where people are walking in the door, paying the flat admissions fee, paying the flat parking fee, and among other things, going over to that one stall that has the copyrighted CDs, that is a direct financial benefit. So here in the record, just to link the two together for you, there are instances where the abuse team members themselves say, this is Joint Appendix 221, this customer will likely fail again, which is infringe again, but let's give him one more chance. He pays $317.63 a month. Joint Appendix 224. Here's another example of a customer that I consider. I understand. I guess I'm just wondering. There's, I think you acknowledge as well, there's this general rule that most courts have accepted that if there's, if you only have, say, a flat fee and monthly payments, generally that's not sufficient for direct profit, profiting directly from the infringement. There are ways to show it despite that, right? You can show a draw that that's why subscribers were coming. You're getting customers because of the opportunity to infringe, et cetera. I'm wondering if we accept your theory, what is left of this general rule about flat fee programs? Sure. I don't think that you need to accept a broad theory that says flat fee can by itself prove vicarious liability, can prove direct infringement. I would say with an asterisk next to that, there are cases that stand for exactly that. Mr. Rosencrantz said there aren't any. I can name you two off the top of my head. Both of them were recited in the NMPA amicus brief. One of them is famous music and the other one is real songs. In both of those, you're talking about flat fees. To your question, I think the distinguishing characteristic here is that we are not talking about one flat fee. We are talking about evidence that was put into the record by the plaintiffs about the graduated fees that were paid, including evidence that a significant number of infringers paid those higher fees for that greater bandwidth. That's at pages 13 and 14 of our brief. There are multiple sites to all of the evidence that was in front of the jury. And that's why I began by saying this is, in some ways, a backhanded attempt to start challenging that evidence. There is evidence in front of a jury about the direct financial benefit from which the jury could have concluded that Cox was benefiting. Cox told its own abuse team that it was benefiting by retaining subscribers. Mr. Rosencrantz said at one point So was there evidence that, you're saying that you did prove a draw, that the jury had evidence that infringers are drawn to Cox's Internet service and pay more for higher speeds for the opportunity to infringe? Judge Rushing, I wouldn't put it just that way, although I think there is evidence from which the jury could have concluded that the infringer paid more, yes. Our points are two in the brief. The first is this notion of draw, which is drawn from an alternative holding in Fonavisa, is not, we think, the driver of the direct financial benefit question. The driver should be the first holding in Fonavisa, which is when you host a swap meet, and you charge people fees for walking in the door and fees for parking and food, and then they can go to all the stalls, including one that has infringing stuff, that's a direct financial benefit. So this draw concept, which has been picked up, I think, by some of the Ninth Circuit cases in particular, should not overtake the general financial benefit standard. It goes a little bit to Judge Floyd's question as well, which is what perspective do you look at this from? The issue, I think, with looking at it from the subscriber perspective here relates to something Mr. Rosencrantz said. Mr. Rosencrantz said there's no evidence that any subscriber quit Cox because it couldn't infringe. That's because Cox never terminated anybody. What we do have is evidence that Cox said, we won't terminate this person because we benefit. And if you look at Ellison versus Robertson, which is where a lot of the draw discussion comes from, the way that Ellison phrases it is, did the ISP either retain subscribers by virtue of infringing activity or lose subscribers if it cut them off? And here you have evidence in the record of the abuse team saying, we can't cut that subscriber off or we'll lose that revenue. We think that was ample evidence for the jury to conclude that there was a direct financial benefit. Ms. Stetson, I'd like to hear your argument as to why you think that Cox has forfeited the contributory liability issue. So with respect to the contributory liability issue, that's the one, there are two prongs. One that went to the jury with respect to material contribution and one that went to the judge and was resolved on summary judgment. I can discuss either of those. I don't think we have a forfeiture argument with respect to contributory liability. We certainly do have one as to an element of vicarious liability. There were arguments below that were very pointed about Cox not being in a position to supervise or control its business subscribers. You can see that in a number of the pleadings that are included in the JA. It's now broadened on appeal to Cox can't supervise or control any subscriber. And we think that was forfeited. We have very strong arguments, of course, on the merits, but I'd be happy to talk about that. The core thing that we think is forfeited is the damages challenge that Mr. Rosenkranz concluded with. Counsel, I thought you thought that, and there's a lot of different Russian dolls in this case, but that with respect to the knowing element of contributory liability, you thought there had been a forfeiture on summary judgment, that there hadn't been an argument about what was required, what kind of specific knowledge was required.  On summary judgment, and this goes, I think, to the colloquy Judge Rushing had with Mr. Rosenkranz, on summary judgment, there was no argument made about what I would now describe as the precognition standard, that an ISP doesn't have the ability to forecast whether Suzy's subscriber is going to download Hurricane in an infringing way. That's not something that was presented in the summary judgment briefing. Mr. Rosenkranz explained that what the other side of that coin is, is that an ISP can't be expected to predict whether a repeat infringer will continue to infringe, but there's a couple responses to that. The first is to remember we are not talking here about a pool of subscribers that just infringed once or twice. Joint Appendix 323 and 1363, the first of those is the site to the district court's explanation that the pool of subscribers at issue here are the pool of subscribers that infringed three or more times, the great majority of them having infringed many more times than three. Joint Appendix 1363, I think, is the most important site for this concept. That is Cox's prior policy. Cox's prior policy was three strikes and you're out. So with respect to knowledge, I think if Cox's prior policy in 2004 to 2007 or 2008 range was three infringements and you're terminated, I think it is more than fair under BMG and under its discussion of what constitutes knowledge for the district court to look at the thousands and thousands of RIAA notices in front of it, all of which specified the subscriber ID, the hash of the file, the date of the infringement, and score on penalty of perjury, in addition to damages claims available under the Copyright Act, that what they were saying was true. That three or more times for a subscriber, Cox used to think that was plenty to terminate, and that is exactly why and how this particular subscriber class was scoped the way that it was. So there's really not an issue, and I think it is an overreach to start talking about this case as being something where a subscriber infringes and then they're cut off the Internet. That is not how this works, both because we're talking about three and up infringements and because for the reason I started with, this is not a case about termination or bust. This is a case where, in Judge Harris's words, Cox just needed to do something. But to have knowledge, to contribute to infringement, you have to have knowledge that infringement is happening and you contribute to it. So it's you're contributing to something that is going to happen in the future. I didn't see any conclusion by the district court with respect to knowledge in that sense. The district court said, well, there were past notices, and that's knowledge. There was no discussion of what we're talking about, which is aiding and abetting, as your friend on the other side put it right, contributing to something with knowledge that you're contributing to it. So I think that actually identifies the kind of precognition standard that we were talking about. If the standard after BMG, which, by the way, is completely in conflict with BMG, but if the standard after BMG is an Internet service provider needs to know that Suzy's subscriber is downloading Hurricane or is about to download Hurricane in order to stop it. Well, it's not in conflict. BMG didn't purport to talk about all aspects of knowledge. It talked about what the parties are arguing in front of it, so it's a particular aspect of knowledge and what it meant in a certain sense. And the court reasoned that it's a general principle of fault-based liability, that someone knows his actions will lead to a certain consequence, that he intends those results. So it's forward-looking. You know that certain results are going to come because of your actions, and you do it anyway. Yes. The court talked about infringement that's substantially certain to result. It's quite a jump to say that we foreclosed the idea that knowledge means knowledge that something's going to happen as a consequence of your actions rather than knowledge that something happened in the past and you're doing, you know, you're contributing to it in the future. So I think if you take that discussion that you're looking at in BMG, including the discussion of the VCR rental, and you put it next to what we're talking about here, there's actually a one-to-one correspondence that maps onto each other. What BMG said was if you have a service that rents VCRs and that service knows that someone that it is collecting rent fees from month by month is using the VCR to infringe, then you can presume that that person, that lessor, has knowledge of infringement. There is no other way under the DMCA's structure which captures ISPs. That's maybe a stretch to say the court said you can presume from one. I mean, isn't that a factual question? Like how many, you know, the person who's leasing the VCR, like how many times do they know this person has used it illegally? Has this person made promises not to do it again? How well do they know? You know, it's a factual question for a jury, right, about what can I know about the consequences of my actions. I think if there were any genuine issues of fact about what Cox knew and when, it might have gone to a jury. I think the problem that Cox has is that the information it had in front of it was thousands of notices identifying with specificity all of those instances of past infringement, not just once, not just twice, but three times and beyond. And, yes, there is a circumstance at that point where it becomes incumbent on the ISP to do something. That is the standard that follows inexorably, as we said in our brief, from BMG. Now, with respect to damages and the time that I have left, I want to talk about. . . Oh, counsel, I'm sorry. Before you move on to damages, you mentioned the supervision prong of vicarious infringement, and I guess I wanted to ask you, and this also goes to the direct financial benefit prong. I understand how you get to where you are on both of these prongs, but let me just tell you my concern and give you a chance to address it. It just seems like we've gone really far afield from kind of the origins of vicarious liability, which is supposed to stem from like a principal-agent relationship, like employer-employee, where here the infringing party is infringing really for the benefit of the defendant and enjoys some kind of a principal-agent relationship. And I understand that there are cases that take us a little bit away from that paradigm, but this just seems like it's a whole different universe. I am really having trouble figuring out how this case is about vicarious infringement. I mean, the one thing that seems undisputed is that these infringers are not agents of Cox, that Cox, in fact, is unable to supervise exactly what they're doing and that whatever they are doing, it is not for the purpose of benefiting Cox. So, Judge Harris, I think just to break that into a couple different pieces, the first is the notion that vicarious liability turns on that principal-agent relationship. That train left the station in 1963 in the Shapiro v. H.L. Green case. That was where the court said, yes, in the past when we talk about vicarious liability as a general common law matter, we're talking about that relationship, but that doesn't fit with certain instances of copyright infringement. So I think beyond that, now what we're talking about is, is there a circumstance where an Internet service provider, which, after all, has been identified by Congress as being eligible for liability under copyright law, is there a circumstance where an Internet service provider with the ability, the conceded ability, I would say, to control access to its platform, directly financially benefits from the infringement? And that's where all of that trial evidence comes in. So as I understand it, your answer is, and this is fine, like, as I said, there are cases that have moved away from that paradigm, and it really doesn't matter. Once we've breached it, go as far as you want. I think not go as far as you want. I don't think you need to write a really expansive decision. I think that this falls easily in line with prior precedents, including the Netcom case from 1995, pre-DMCA, that talked about the limits of liability here. It follows from A&M Records v. Napster from 2001 in the Ninth Circuit. This is not new ground that we're talking about. This is simply an application of common law principles of vicarious infringement to an entity that was able to control access to its platform and directly benefited, as the jury heard, from all of that testimony and all of the evidence that I mentioned. And again, at pages 13 to 14 of our brief, I lay out all of the sites, so not to burden you with them now. Let me say this about damages. Mr. Rosencrantz described the act of, and I know my time is up, but I hope I can finish this. We give Mr. Rosencrantz a little extra time. Mr. Rosencrantz described this damages question as, you know, it would take a lot of work to put together Plaintiff's Exhibit 1 and Plaintiff's Exhibit 2, which were the two lists of sound recordings. Cox conceded below, and the District Court realized this, at Note 10 of its post-trial submission, that it would take a lot more than that. What it took, actually, was Cox's counsel, after the fact, post-trial, going into those various lists and looking at copyright registrations and determining, among other things, whether there were overlaps that looked like overlaps but actually pertained to different songs. So just to give you the critical sites here, this is Joint Appendix 1027. This is what Cox called Schedule 2. And this is part of its 90-page submission of charts and graphs at post-trial. And Schedule 2 has to do with the circumstances where a song looks like it might be the same song as one that's on the musical composition list, but turns out it's not. And I'd point you to a couple. Joint Appendix 1029, in that same chart, sixth row, the Cars song, Let's Go. And what Cox's counsel say are, the date of first publication listed on the sound recording registration significantly predates the date of first publication listed on the music composition certificate. Next page, Joint Appendix 1030, Meatloaf, the song What About Love. Can I ask you about what about their main argument, which is that after trial, the plaintiffs didn't dispute that 2,235 works were, in fact, derivative. They say that the district court had no choice but to grant judgment on those, to take those out of the count because there was no dispute of fact based on the evidence at trial that those works were derivative. What's your response to that? The response is our discussion after the fact of various sound recordings and compositions is really irrelevant to the question whether Cox forfeited this argument by not putting evidence in front of the jury for the jury to be able to make this determination. So what we had, remember, going into the jury trial was a statement by the judge at summary judgment saying genuine issues of material fact preclude summary judgment as to all of the other arguments except for a couple that the parties raised. District court reiterated in its post-trial order the court denied that motion for summary judgment on the score because issues of fact remained that were proper for determination at trial by a jury. What you heard Mr. Rosenkranz mention earlier was that those pieces of evidence were sought to essentially come in through the very last witness, an expert who had not testified to it in his reports and was not permitted to testify to it. So this is an example, I think, of kind of a backdoor challenge to what at bottom is an evidentiary ruling because what's very clear from the post-trial, post hoc factual judgment calls, as the district court described them, is that Cox's counsel had to sit down. It's not just plaintiff's exhibit one, plaintiff's exhibit two, do the math and come up with a number. It's much more complicated. Sorry. Is it fair to say, I just want to make sure I understand the positions correctly. Is it fair to say maybe the parties agree and counsel for both sides can look at this evidence and make sense of it and agree that there's 2,000-something derivative works, but the jury, given the evidence in front of it, did not have the evidence and the guidance that needed to make that determination. The jury could have found 10,000 works infringed because they didn't have guidance to make the derivative distinction. It could indeed. It had no guidance, in fact. And let me cite you one other joint appendix site that I think is worth telling us. I'm sorry, just before you move on, because I'm afraid I still don't quite understand. And I haven't seen a posture like this before. But once Sony concedes, after the fact, it becomes undisputed. There no longer is a jury question after the fact as to 2,200 of these works. Is that right? No, I don't think that's right. I think that's Cox's over-reading. Okay, that's the part I'm missing. First, because the reason that we haven't seen this before is that there is literally no other time that this has ever been attempted before. But after the fact, what Sony was confronted with was an argument from Cox that said, this is just a ministerial thing. You just compare these two charts and shazam. It turns out, of course, that's not the case. That's what the district court concluded. And so what Sony was confronted with was that argument. Its response was, this isn't proper. This is a fact question. But if you are going to conclude that you can somehow reach this despite it being a fact question, here are the ones that we would take particular issue with. I don't think it's fair to kind of... Particular issue, so you never said that you only, you said we'll take issue with all of them, but we're particularly worried about this batch? Is that right? I think that's much more accurate. We took issue with all of them because we thought it was completely inappropriate for Cox, after the fact, to be asking for what was quintessentially a fact determination. So you are saying it is not, in fact, undisputed that 2200 and change are derivative. You did dispute that. I think we disputed, we specifically disputed 2200 and change. I think the gap between where Cox is coming from and where Sony is coming from is the idea that by not specifically disputing the rest, we somehow conceded the rest. After the fact, after a jury verdict, that should have heard this evidence. At the point where Cox is starting to put in factual arguments, all we needed to do and what we did was to say these are factual questions. They should have gone to the jury and they didn't. If it was the case, by the way, that the district court at summary judgment found certain things not disputed, presumably he could have ordered partial summary judgment on those works, and he did not do that. Joint Appendix 710, I think, points up the reason this needed to go to a jury, and this is Cox's own counsel. What he says right before the last couple days of trial is, quote, it may shock the court, but I actually hadn't forgotten about putting on evidence with regard to this. We understand that we have the burden to put in that evidence, and the evidence never came in. What you're hearing now is an attempt to back load all that evidence in so that Cox's counsel can make the kind of judgment calls after the fact that it attempted to make post-trial, and which the district court rejected. If there are no further questions. Thank you, Your Honor. Your Honor, just a few quick points. First, to start at the beginning where Ms. Stetson started, Judge Harris, you are right. Plaintiffs have completely changed their theory during oral argument. Look at their briefs. Their brief on appeal talks about what we should have done. It's all about termination. Not a word about not doing enough to educate. You won't find the words educate in their brief at all. And that's because that's all that the district court found because that's all that the theory of this case was about, the do something. Counsel, can I say, tell me what I'm missing. It looks to me, I agree with you, as though Sony is coming in and asking us to embrace an extremely broad theory of liability. But I don't actually understand the district court to embrace that theory. What the district court says is it seems to adopt some version of the simple measure standard. And then it says Cox came in and it argued we did do simple measures. We didn't terminate people, but we did lots of other things to address infringement. And then the district court says on this evidence the jury was well within its rights to reject that as a matter of fact and find that Cox did nothing. That's how I read the district court. But am I misunderstanding something? Excuse me. That's not how I read the district court because the do something that the district court said we did not do was terminate. I mean, you asked whether a jury could conclude that we did nothing. But, I mean, we created an anti-piracy program from scratch that became the model for the rest of the ISPs. Counsel said, Ms. Stetson said that we should have educated, we should have deterred, we should have suspended. We did educate, we did deter, we did suspend 60,000 people. That's why their theory was about termination, not about the quality of all the steps up through 13 leading to termination. On direct financial benefit, again, Judge Harris, your intuition is right. This is really far afield from the origins of vicarious liability, which were all about agents. Judge Rushing, you asked the question about evidence that Cox would have made less money if subscribers stopped infringing. The answer is no. There's absolutely zero evidence. Their evidence was all about bad e-mails, e-mails suggesting that some employees were disinclined to terminate some subscribers, that is the ones at the very top of the pyramid, because they wanted to continue collecting the monthly fee. But receiving fees as a result of not terminating service is not the same as receiving fees from the infringement. It is not money that we made because of the infringement. And it doesn't prove what has to be proven, which is that we had a financial interest in making sure that the infringement continues. We know that Cox... Can I ask you something about that that has to do with the amount of damages? Yes. The statutory damages are very, there's a lot, the jury can consider a lot of factors, right? And the jury instruction listed a number of things that could be considered in setting what the judge called an amount you find to be fair. One of the things was, one of the factors is profits Cox earned because of the infringement. Is that, it sounds to me like that is tied to a finding of vicarious liability, not contributory. But I wanted to get your read on that. Yes, Your Honor. I mean, you cannot figure out what the ultimate damages amount was tied to. Some elements may have been about vicarious. Some elements may have been about contributory, which is one of the reasons is, excuse me, which is one of the reasons that if this court vacates on one ground and not the other, it needs to crank through the jury instructions and see how that could have affected either damages or willfulness. Well, counsel, can I stop you there? If, hypothetically, we were to reverse on one ground but not the other, does that mean we'd have to send it back for a new trial on damages? Yes, Your Honor, absolutely. Let me give you the easiest example. If this court reverses on knowledge, this court has to award a new trial on damages, and in particular on willfulness, because the district court, in directing a verdict about knowledge, essentially directed the verdict about willfulness because it said you can find that it was willful if you find that Cox knew that the subscribers were infringing. What if, hypothetically, we reverse on vicarious infringement but not contributory infringement? Would that require a new damages trial? For the reason that Judge Rushing was just saying, that some of the elements are directly tied to vicarious liability. Just for example, I mean, there's so much discretion in there. If the jury had concluded that we had a direct financial benefit, all the more reason to award higher damages. And so it would go both to — Does it matter? Did you ask for a special verdict form on damages so that the jury would have had to allocate? No, Your Honor. Does that matter? So the answer is no, and no, it doesn't matter. That is exactly what happened in the cases that this court decided that we cited. Most notably — Sorry. It's okay. If it's in your briefs, I've got it. But the Barber case, there was — Actually, Barber and Tire Engineering, there were specific findings about liability but not about damages, which was exactly why it was reversed. If I may just finish the point I was making about the emails. Every business makes more money if they don't terminate or don't evict a misbehaving customer. But that doesn't mean that they are benefiting directly from misbehavior. By plaintiff's logic, ISPs are liable for every transgression that occurs on the Internet if they fail to terminate the bad actor upon notice. In each instance, the ISP would make more money if they don't terminate. But that doesn't give the ISP what it needs on plaintiff's theory, which is a financial interest in the infringement. Let me just close with this. This is, by plaintiff's own concession in this argument, this case is about three notices and terminate. That is the rule that plaintiffs are asking this court to adopt. And how this court applies traditional principles in this new context will have profound implications for the Internet and connectivity going forward. Plaintiffs are seeking this draconian regime that will force ISPs to terminate an entire household, university, business, or sprawling regional services provider. Based upon three accusations of 99-cent infringements, if the ISP declines to terminate, it will be liable for a penalty of up to $150,000 for each work infringed. Two or three anonymous subscribers on a regional ISP infringe, tens of thousands of families and businesses get thrown into Internet diaspora. A hospital orderly downloads three songs and the entire hospital gets cut off. Grandma has Junior over for a long weekend and he downloads three songs, she gets kicked off. And just bear in mind, this is not just about infringement. A lot of bad things happen on the Internet. Bullying, false speech, sale of illegal goods. Just notify the Internet provider and they now have to terminate, possibly upon the third accusation. Affirming here will fundamentally distort the law of secondary liability. No one ever thought that they could sue Ma Bell if you gave her notice that crime syndicates were using the telephone wires. A telephone company too could be cut off. If I may just have one more sentence. One sentence. Internet is no different from any of these other communications. And if you break out Internet for special treatment, you will end up breaking the Internet. Thank you, Your Honors. Thank you. Thank you both very much. We are very sorry that we cannot come down and shake hands, as would be our custom, but we very much appreciate your help today. And stay safe. Thank you, Your Honor.
judges: Pamela A. Harris, Allison J. Rushing, Henry F. Floyd